IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

Portland Division

REBECCA ELIZABETH WATTS                    3:10-CV-822-MA

       Plaintiff,                        OPINION AND ORDER

v.

MICHAEL ASTRUE,
Commissioner of Social
Security,

       Defendant.

TIM WILBORN
WILBORN LAW OFFICE, P.C.
P.O. Box 2768
Oregon City, OR 97045
(503) 632-1120

       Attorney for Plaintiff

DWIGHT C. HOLTON
United States Attorney
ADRIAN L. BROWN
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR  97204-2902
(503) 727-1003
DAVID R. JOHNSON
Special Assistant United States Attorney
701 Fifth Avenue, Suite 2900 M/S 221A
Seattle, WA  98104-7075
(206) 615-2545

       Attorneys for Defendant

1 - OPINION AND ORDER

MARSH, Judge.

Plaintiff seeks judicial review of the Commissioner's final decision denying her July 7, 2006, application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-83f.  Plaintiff urges the court to remand this matter to the Commissioner for an immediate award of benefits, or for further proceedings.

For the following reasons, this matter is **REMANDED** to the Commissioner for further proceedings to reevaluate evidence of plaintiff's impairments related to depression, anxiety, and PTSD, and consider plaintiff's GAF score of 50 in determining plaintiff's ability to engage in substantial gainful activity.

### BACKGROUND

In her SSI application, Plaintiff asserts she has been disabled since July 1, 2006, because of depression, post-traumatic stress disorder (PTSD), and seizures caused by vertigo. The Commissioner denied her application initially and on reconsideration.

On March 3, 2009, plaintiff and vocational expert (VE) Gail Young testified before an administrative law judge (ALJ).

On June 30, 2009, the ALJ issued a decision that plaintiff is unable to perform her past relevant work but is able to perform medium unskilled jobs such as laundry worker and industrial cleaner.

On May 19, 2010, the Appeals Council denied plaintiff's request for review.  The ALJ's decision, therefore, is the final decision of the Commissioner for purposes of judicial review.

### THE ALJ'S FINDINGS

The Commissioner has developed a five-step sequential inquiry to determine whether a plaintiff is disabled.  <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140 (1987).  <u>See</u> <u>also</u> 20 C.F.R. § 416.920. Plaintiff bears the burden of proof at Steps One through Four. <u>See</u> <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1098 (9th Cir. 1999).  Each step is potentially dispositive.

At Step One, the ALJ found plaintiff has not engaged in substantial gainful activity since July 7, 2006.

At Step Two, the ALJ found plaintiff has severe impairments including depression, PTSD, and vertigo.  20 C.F.R. § 416.920©.

At Step Three, the ALJ found plaintiff's impairments do not meet or equal a listed impairment.

The ALJ found plaintiff has the residual functional capacity to perform a full range of work at all exertional levels, but she has non-exertional limitations because of her vertigo that require her to avoid a work environment where there are fumes, odors, dust, gases or any other such hazards.  She is also limited to simple, repetitive tasks with no public contact.

At Step Four, the ALJ found plaintiff is unable to perform her past relevant work as a caregiver but is able to perform the

jobs of laundry worker and industrial cleaner.

Based on these Findings, the ALJ found plaintiff is not disabled and, accordingly, is not entitled to SSI.

**LEGAL STANDARDS**

The plaintiff has the burden initially to prove she is disabled.  Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122 (1996).  The plaintiff must present evidence showing an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Commissioner, however, has a duty to "fully and fairly develop the record if the evidence is ambiguous or the record is inadequate to allow for a proper evaluation." Mayes v. Massanari, 276 F.3d 453, 459-60 (9th Cir. 2001).

The Commissioner's final decision must be affirmed if the ALJ applied proper legal standards and made findings supported by substantial evidence in the record. 42 U.S.C. § 405(g). Substantial evidence "is more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).

The court must weigh all the evidence whether it supports or detracts from the Commissioner's final decision.  <u>Martinez v. Heckler</u>, 807 F.2d 771, 772 (9th Cir. 1986).  The court must uphold the decision, however, even if it concludes that evidence "is susceptible to more than one rational interpretation." <u>Andrews</u>, 53 F.3d at 1039-40.

The decision whether to remand for further proceedings or for an immediate payment of benefits is within the discretion of the court.  <u>Harman v. Apfel</u>, 211 F.3d 1172, 1178 (9th Cir.), <u>cert</u>. <u>denied</u>, 121 S. Ct. 628 (2000).  "If additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded."  <u>Lewin v. Schweiker</u>, 654 F.2d 631, 635 (9th Cir. 1981).

### **ISSUES ON REVIEW**

Plaintiff contends the ALJ (1) failed to give clear and convincing reasons for rejecting the uncontradicted medical opinions of treating and examining physicians; (2) failed to give clear and convincing reasons for rejecting plaintiff's testimony; (3) failed to give germane reasons for not crediting the lay evidence of plaintiff's friend; and (4) failed to include all of plaintiff's workplace limitations in the hypothetical posed to the VE for the purpose of formulating plaintiff's residual functional capacity (RFC).

## EVIDENCE

The evidence includes the March 3, 2009, hearing testimony, plaintiff's SSI application, relevant medical records, and work history, disability, daily living activities, and lay witness reports.

**Plaintiff's Evidence**.

Plaintiff testified at the hearing and completed an Adult Function Report listing her daily activities.

Hearing Testimony.

On the date of the hearing, plaintiff was 40 years old. She completed the 8th grade. She has difficulty understanding what she reads, concentrating, and remembering what she watches on television.

Plaintiff last worked as a caregiver in 2006. She had to leave that job because she has a criminal record involving charges of domestic violence, child neglect, and harassment. The domestic violence involved an incident where she attacked her boyfriend, purportedly to protect her son. At the time, she and her boyfriend had been drinking although she denies she is a problem drinker.

Plaintiff used marijuana in the past but quit five months before the hearing. She used methamphetamine during her first marriage which ended 16 years earlier.

When plaintiff was 12 years old she was around boys who hit her.  She learned to protect herself by responding to the violence with violence.  In later years she underwent anger management treatment but she still has occasional violent outbursts that are triggered when she perceives threats to her children or to herself.

Plaintiff was struck in the head repeatedly when she was younger.  More recently, in her first marriage, her husband slapped her across her face so hard that it damaged her right eardrum.  On occasion, plaintiff's head will "thump," causing dizziness, nausea, and vomiting.  The dizziness occurs when she moves her head up and when she is exposed to heights.  She then has to lie down in a quiet, dark place, sometimes for the entire day.

Plaintiff is uncomfortable around people because she believes they talk behind her back and intend to hurt her.  As a consequence, she has not worked well with job supervisors.

Plaintiff has difficulty sleeping and sometimes is not refreshed in the mornings.  She lives from day-to-day.  Once or twice a month she has thoughts of hurting herself, and she was hospitalized in 2006 after she attempted to do so.  Thereafter, she received counseling to address issues she had with an abusive boyfriend with whom she had lived for eight years.

Adult Function Report.

Plaintiff "piddle[s] around" and cleans the house and feeds the dogs until she feels a vertigo-related seizure coming on at which time she goes to bed until she "is strong enough to get up." She is no longer able to work as a caregiver because of her seizures. She sometimes forgets to take her medications.

Plaintiff is able to cook her own meals, clean house, do the laundry, and grocery shop, unless she has a seizure. "Seizures control everything" plaintiff does, i.e., every conceivable form of physical activity, as well as impairing her memory and her ability to concentrate.

Plaintiff has problems getting along with family, friends, and neighbors because of her mental and emotional instability.

**Lay Witness Evidence**.

Plaintiff's friend of 35 years stated that plaintiff has anxiety that causes insomnia. When she is sick, plaintiff "can't move due to dizziness." Plaintiff is able to do housework such as laundry, cooking, and vacuuming, but yardwork "makes her dizzy." Plaintiff is able to drive a car. Her dizziness and occasional seizures adversely affect her eyesight, memory, concentration, and her ability to stand, lift, reach, climb stairs, complete tasks, handle stress and changes in routine, and get along with others. Plaintiff also suffers from depression and chronic fatigue.

8 - OPINION AND ORDER

**Vocational Expert.**

The ALJ asked the VE to assume the following in determining whether plaintiff was able to perform jobs involving substantial gainful activity:  Plaintiff's IQ is 73 and she has borderline intellectual functioning; her work-history includes semi-skilled medium-exertion jobs as a caregiver; and she needs to avoid fumes, odors, dust, gases, and any hazards.  Based on that information, the VE opined plaintiff's dizziness precludes her from performing any jobs involving exposure to fumes, odors, dust, gases, or other hazards.  The VE, however, opined plaintiff is capable of performing unskilled medium-exertion jobs such as laundry worker and industrial cleaner/janitor notwithstanding plaintiff's IQ of 73 and borderline intellectual functioning. The VE also opined, however, that if plaintiff was unable to perform tasks involving three or more steps, she would be incapable of performing any substantial gainful activity.

**Medical Evidence - Treatment.**

Umatilla County Mental Health.

In July 2003, plaintiff began a court-mandated treatment program to address the following issues:  Outbursts of anger that impaired her social functioning; family stress; and substance abuse/dependence on alcohol and drugs, gambling, and other compulsive behaviors.  Plaintiff missed several of the monthly sessions because she was unable to pay for them.

9  - OPINION AND ORDER

An April 2004 report on plaintiff's final session noted she
felt hopeless and was skeptical that anyone could help her, even
though she acknowledged during the course of the program that the
quality of her life had improved, from 4 on a 1-10 scale at the
start to 7 at the end of the program.  Plaintiff was given a
"personal mission" statement to complete, but she failed to do so
because she "had too many other things to do."

Oregon Health Sciences University Hospital.

In March 2004, plaintiff was treated for nausea, dizziness,
blurred vision, and severe fatigue that began three years
earlier.  Her symptoms increased over time to 2-3 episodes a
week.  Treating physician Samuel Smiley, M.D. diagnosed dizziness
"of unclear etiology."  He further opined plaintiff would benefit
from neurologic and opthalmological evaluations.

St Mary's Physician Group/Medical Center.

In March 2005 plaintiff was treated for depression and
anger.  She managed her anger but "play[ed] the victim role" and
was "directionless."  She used marijuana two-three weeks earlier.

In May 2005, Lauri Larson, M.D., opined plaintiff suffered
from neurotic depression which was eased by medication.

In December 2005, ear specialist Glyn Marsh, M.D. examined
plaintiff for dizziness and vertigo.  Plaintiff was "frustrated
and irritated" by the persistence of her symptoms.  She refused a
prescription for Meclizine, an anti-vertigo medication.

In January 2006, Dr. Marsh diagnosed Probable Benign Paroxysmal Vertigo (an inner ear disorder).

In September 2006, plaintiff called Dr. Larson's office, complaining that she was having a severe episode of vertigo and that she had tried to slit her wrists.  She was advised to take an ambulance to the Emergency Room.  A roommate of plaintiff's stated the wounds were "very superficial-looking."

The Emergency Room report reflects plaintiff was diagnosed with dizziness from an "unclear cause," abrasions and lacerations to her left wrist, and depression/anxiety.

In early October 2006, plaintiff missed two appointments with Dr. Larson.  Later that month, she complained of insomnia and restless leg syndrome.  She stated she was tied to her husband for economic reasons even though he was alcoholic and "exceedingly violent, verbally and mentally abusive."  She also stated that a former partner had recently died in an automobile accident.  On examination plaintiff was depressed and emotionally distraught, displaying anger and disgust at her situation.

In December 2006, Dr. Larson opined that plaintiff "suffers from a very severe social circumstance as well as an organic medical complication that causes her to be unable currently to participate in job search activities or education."  She expected her "condition" to last for at least six months.

<u>Lourdes Counseling Center</u>.

Approximately three weeks after her September 6, 2006 purported suicide attempt, plaintiff was admitted to Lourdes for psychiatric care.  She stated she had been depressed and had suicidal ideations her entire life.  The only illicit substance she was then using was marijuana.  She was diagnosed with Major Depressive Disorder - severe, PTSD, and Panic Disorder with Agoraphobia.  Both on admission and on discharge three days later, plaintiff was assigned a GAF score of 20, <u>i.e.</u>, she was in some danger of hurting herself or others.

When she was discharged, the Benton County Superior Court in Washington issued an order committing plaintiff to a mental health treatment facility for 14 days because she presented "a likelihood of serious harm to herself."

<u>Family Medical Center</u>.

In August 2007, Family Practitioner Jeanette Flammang, M.D., began treating plaintiff for vertigo.  On examination, plaintiff was in moderate emotional distress.

In September 2007, Nurse Practitioner Dawn Meicher requested that plaintiff be excused from vocational rehabilitation classes because she was being evaluated "for multiple psychiatric and medical conditions" that were "unstable with symptoms of extreme vertigo, headaches, tearfulness, and anxiety."

In October-November, 2007, Meicher diagnosed chronic dizziness and bipolar disorder.  An MRI scan was normal.

In February 2008, Evelyn Rodriguez, M.D., diagnosed plaintiff as suffering from vertigo, with an unclear etiology. Dr. Rodriguez noted the doctor-patient relationship was not working, and plaintiff "walked away."

William Ashby, M.D.

In March 2008, internist William Ashby M.D. began treating plaintiff for complaints primarily related to chronic dizziness, migraine headaches, bipolar disorder, depression, and insomnia.

In April 2008, he noted plaintiff was "mildly depressed" but "otherwise in no apparent distress."  She was, however, "a little wobbly with ambulation."

In May 2008, plaintiff's depression and insomnia had improved, her bipolar disorder was stable, but the cause of her chronic dizziness remained uncertain.

In July 2008, plaintiff's bipolar disorder and depression remained stable but she still complained of chronic dizziness.

In November 2008, plaintiff again complained of anxiety, symptoms, bipolar disorder and depression, and a new condition related to restless leg syndrome.

In February 2009, plaintiff complained of tension headaches, chronic anxiety, chronic dizziness, and bipolar disorder.

In March 2009, Dr. Ashby completed a preprinted "Rating of
Impairment Severity Report" regarding plaintiff's disability
claim.  He checked those boxes indicating plaintiff is able to
stand for up to one hour at a time, sit for four hours or more at
a time, work a total of fours each day, sit and/or stand for two
hours in an eight-hour day, occasionally lift up to 10 lbs less
than one-third of the workday and frequently lift up to five
pounds more than one-third of the workday.  She should never
bend, stoop, or elevate her legs.  She is able to use her hands
and arms frequently.  Plaintiff is able to climb ramps and stairs
but she should never climb ropes, ladders, or scaffolds, balance,
stoop, or extend her head and neck to look up or down.  Finally,
plaintiff is mildly impaired in her ability to understand,
remember, and carry out simple instructions, moderately impaired
in her ability to work with others, accept ordinary workplace
supervision and criticism, be aware of and take precautions
against workplace hazards, and get along with coworkers, and she
is markedly impaired in her ability to understand, remember, and
carry out detailed or complex instructions, maintain attention
and concentration, interact appropriately with the general
public, be punctual, maintain regular attendance, and complete
work on time.

**Medical Evidence- Examination/Evaluation**.

  Stephen Condon, Ph.D. - Psychologist.

  In June 2005, Dr. Condon evaluated plaintiff psychologically and assessed a GAF score of 50 - serious impairment in social, occupational, or school functioning.  Plaintiff's IQ was between 69-78, placing her in the 4th percentile.  Her social functioning was markedly impaired, and her concentration, persistence, and pace "may" have been moderately impaired.  Her intellectual functioning was borderline.

  Dr. Condon opined plaintiff "would probably need special supervision in order to sustain an ordinary routine in a work situation."  Her "personality issues" likely constituted a "potential vulnerability" in her "work adjustment" and she would not "tolerate public contact or close work with coworkers or supervisors."  She would also need "a predictable work setting with help in making reasonable work goals" and "non-hazardous [work] settings."

  Dr. Condon opined plaintiff is incapable of handling funds because of a history of substance abuse primarily involving marijuana.  She is, however, able to understand and remember a variety of tasks and routines.

  In October 2006, Dr. Condon again evaluated plaintiff and assigned the same GAF score of 50 he had assigned 16 months earlier.  He diagnosed Mood Disorder NOS, Cannabis Abuse, R/O

Somatoform Disorders including Conversion Disorder, and Rule Out
Post-Traumatic Stress Disorder.

### Terrel L. Templeman, Ph.D. - Clinical Psychologist.

In July-August 2009, Dr. Templeman evaluated plaintiff's
psychological health.  He assessed plaintiff's IQ at 72, within
the range previously assessed by Dr. Condon.  He also assigned a
GAF score of 50, the same as the score assessed by Dr. Condon.

Dr. Templeman opined plaintiff's complaints regarding poor
balance and dizziness are related to her emotional problems.  He
also opined, however, that plaintiff's level of functioning is
not as low as her IQ test scores suggested.  She is capable of
understanding and following at least simple verbal and written
instructions and is able to read at a 9th grade level.  She is
also capable of working independently, taking appropriate action
in emergencies, and avoiding hazards.

Dr. Templeman further opined that plaintiff's "temperament,
oppositional attitude, and low frustration tolerance" would more
than likely "create problems for her on the job."

**Medical Evidence - Consultation.**

### MaryAnn Westfall, M.D. - Physical Medicine.

Dr. Westfall reviewed plaintiff's medical records on behalf
of the Commissioner and opined plaintiff has no exertional
limitations.  Her only postural limitation is to avoid climbing
ladders, ropes, and scaffolds.  Finally, her only environmental

16 - OPINION AND ORDER

limitations are to avoid concentrated exposure to fumes, odors, gases, and hazards such as machinery or heights.

    Peter LeBray - Psychologist.

    Dr. LeBray reviewed plaintiff's medical records and opined plaintiff has borderline intellect, a mood disorder with symptoms of anxiety, borderline dependent personality disorder, and marijuana dependency. He opined she is able to understand and remember a variety of tasks and is able to complete simple, routine tasks. She should not have any public contact or a need to work closely with co-workers or supervisors. She should work in a predictable setting in which she is able to set reasonable work goals in a nonhazardous workplace setting.

    Dr. LeBray assigned a GAF score of between 55-60 (moderate difficulty in social, occupational, or school functioning).

    In summary, Dr. LeBray found plaintiff has mild restrictions of daily living activities and moderate difficulties maintaining social functioning, and concentration persistence and pace.

## ANALYSIS

**Plaintiff's Credibility**.

    Plaintiff contends the ALJ failed to give clear and convincing reasons for not crediting her testimony regarding the severity of her physical impairments. I disagree.

    The ALJ found plaintiff's testimony regarding the severity of her impairments, particularly relating to vertigo "could

17 - OPINION AND ORDER

reasonably be expected to cause [] some of her alleged symptoms," but her statements concerning the intensity, persistence and limiting effects of these symptoms are not fully credible."

A plaintiff who alleges disability based on subjective symptoms "must produce objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged. . . .'" Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir. 1991) (quoting 42 U.S.C. § 423(d)(5)(A) (1988)).  See also Cotton v. Bowen, 799 F.2d 1403, 1407-08 (9th Cir. 1986).  The plaintiff need not produce objective medical evidence of the symptoms or their severity. Smolen v. Chater, 80 F.3d 1276, 1281-82 (9th Cir. 1996).

If the plaintiff produces objective evidence that underlying impairments could cause the pain complained of and there is not any affirmative evidence to suggest the plaintiff is malingering, the ALJ is required to give clear and convincing reasons for rejecting plaintiff's testimony regarding the severity of his symptoms.  Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993). See also Smolen, 80 F.3d at 1283.  To determine whether the plaintiff's subjective testimony is credible, the ALJ may rely on (1) ordinary techniques of credibility evaluation such as the plaintiff's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the plaintiff that appears less than candid; (2) an unexplained or inadequately

explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the plaintiff's daily activities. Id. at 1284 (citations omitted).

In her findings, the ALJ did not question that plaintiff suffers from vertigo or that it is a severe impairment. The ALJ, however, questioned the credibility of plaintiff's statements regarding the frequency and severity of her dizziness symptoms. In particular, the ALJ noted plaintiff had made "intermittent" complaints of vertigo but failed to "follow through when further testing or treatment for her vertigo" had been recommended by both treating and evaluating physicians. The ALJ also noted plaintiff is able to engage in routine daily activities such as personal grooming, cleaning house, and running errands.

The court notes plaintiff's daily activities, as described in her Adult Function Report, also include cooking, laundry, grocery shopping, and caring for her pets. Although plaintiff asserts she is unable to perform these chores when she has "seizures," i.e., bouts of dizziness, the record is unclear regarding the frequency of the seizures. The court also notes the lay witness reported plaintiff became dizzy when she did yardwork, but not when she did household chores.

On this record, the court finds plaintiff presented substantial medical evidence that she suffers from vertigo, and

as a consequence, has dizzy spells that limit some of her daily living and workplace activities.  The court, however, also finds the ALJ gave clear and convincing reasons, based on the lay witness report and medical evidence, not to fully credit plaintiff's statements regarding the frequency and duration of plaintiff's dizziness spells, i.e., vertigo, and their impact on her daily living and workplace activities.

**Lay Witness Evidence.**

Plaintiff contends the ALJ did not give germane reasons for not crediting lay evidence of plaintiff's friend as to the impact of plaintiff's dizziness on her daily activities.  I disagree.

Lay witness evidence as to a claimant's symptoms "is competent evidence that an ALJ must take into account" unless he "expressly determines to disregard such testimony and gives reasons germane to each witness for doing so."  Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001).

In her decision, the ALJ appropriately accounted for the lay evidence and gave it moderate weight regarding plaintiff's level of functioning, i.e., her description of plaintiff's daily living activities, which the ALJ found were greater than claimed by plaintiff.  The ALJ properly rejected the lay evidence only to the extent the lay witness purported to evaluate plaintiff's physical impairments.

**Treating and Examining Physician Evidence**.

Plaintiff contends the ALJ failed to give clear and convincing reasons for rejecting the medical/psychological opinions of treating physicians Dr. Larson and Dr. Ashby, and examining psychologist, Dr. Condon.  I agree.

The Commissioner must provide clear and convincing reasons for rejecting the opinion of treating physicians and the uncontradicted opinion of examining physicians.  <u>Turner v. Commissioner</u>, 613 F.3d 1217, 1222 (9th Cir. 2010), <u>citing</u> <u>Lester v. Chater</u>, 81 F.3d 821, 830-31 (9th Cir. 1995).

<u>Dr. Larson - Treating Physician</u>.

In December 2006, Dr. Larson opined plaintiff had "an organic medical complication that causes her to be <u>unable currently to participate in job search activities or education</u>" <u>which was expected to for at least six months.</u>" (Emphasis added).

The ALJ rejected this opinion because Dr. Larson had a "limited treating relationship with [plaintiff]" and is "a family doctor and does not specialize in psychiatry or psychology."

The court agrees with plaintiff that the ALJ did not give clear and convincing reasons for rejecting Dr. Larson's opinion regarding plaintiff's ability to look for a job in December 2006. A treating physician who has not specialized in psychiatry or psychology may, nevertheless, offer an opinion in that area. 20 C.F.R. § 416.927(d)(5).  Moreover, Dr. Larson had a doctor-

patient relationship with plaintiff that spanned a two year-period of time.  Although Dr. Larson may have seen plaintiff infrequently, in part because plaintiff on occasion missed appointments, the record clearly reflects Dr. Larson was familiar with plaintiff's medical and psychological impairments.

The court also notes Dr. Larson placed a relatively short-time-frame of six months during which she perceived plaintiff would have difficulty looking for a job.

On this record, the court concludes the ALJ did not give clear and convincing reasons for rejecting Dr. Larson's opinion as to plaintiff's inability to look for a job or engage in substantial gainful activity for a limited period of time after December 2006.

Dr. Ashby - Treating Physician.

The ALJ gave "little weight" to the opinion of treating physician, Dr. Ashby, as to plaintiff's physical workplace limitations on the ground that it was not supported by objective medical evidence, and Dr. Ashby apparently did not have access to plaintiff's full medical history, which, according to the ALJ, reflected only "intermittent complaints of vertigo."

Instead, the ALJ gave more weight to opinions of consulting physicians and psychologists who had access to  plaintiff's medical records but did not examine or treat her.  On this record, the court concludes the ALJ did not err in doing so.

22 - OPINION AND ORDER

There is substantial evidence in the medical record that plaintiff suffers from vertigo on a continuing basis. Moreover, the ALJ found it is a severe impairment. Nevertheless, as set forth <u>infra</u> at 19, the record does not support plaintiff's assertion that her episodes of vertigo preclude her from engaging in substantial gainful activity. To the contrary, the ALJ and the VE took into account limitations arising from plaintiff's severe vertigo in determining her residual functional capacity.

<u>Dr. Condon - Examining Psychologist</u>.

As set forth above, Dr. Condon examined plaintiff twice, in June 2005 and October 2006, and on both occasions, assigned a GAF score of 50. The ALJ mentioned the latter examination in her opinion and concluded Dr. Condon's diagnoses of depression, anxiety, and PTSD were consistent with the medical record in general. The ALJ, however, appears not to have considered the GAF score assigned by Dr. Condon when she made the finding that plaintiff was able to perform a full range of work at all exertional levels, with only non-exertional limitations related to vertigo.

**<u>Residual Functional Capacity (RFC) Hypothetical</u>**.

The court concludes the ALJ's hypothetical to the VE was inadequate because it did not include any workplace limitations that might arise from plaintiff's depression, anxiety, and PTSD, the severity of which is reflected in her GAF score of 50.

23 - OPINION AND ORDER

**SUMMARY**

On this record, and in the exercise of my discretion, I conclude that this matter must be remanded to the Commissioner for further proceedings in which the Commissioner shall obtain additional evidence as to plaintiff's psychological impairments related to depression, anxiety, and PTSD, and also specifically take into account plaintiff's GAF score of 50 in deciding whether plaintiff has the ability to engage in substantial gainful activity. See Harman v. Apfel, 211 F.3d 1172, 1178 (9th Cir.), cert. denied, 121 S. Ct. 628 (2000).

**CONCLUSION**

For these reasons, the final decision of the Commissioner is **REVERSED** and this matter is **REMANDED** pursuant to Sentence Four of 42 U.S.C. § 405(g) for further proceedings as set forth above.

IT IS SO ORDERED.

DATED this 24  day of July, 2011.


    /s/ Malcolm F. Marsh
MALCOLM F. MARSH
United States District Judge

24 - OPINION AND ORDER